2000 ME 131

**Robin KAPLER**

v.

**George KAPLER.**

**George Kapler**

v.

**Isabel McKay.**

Supreme Judicial Court of Maine.

Submitted on Briefs June 27, 2000.
Decided July 10, 2000.

**504**

Armanda D. Beal, Esq., Bangor, for the appellant.

Dawn M. Pelletier, Esq., Pelletier & Faircloth, Bangor, for Robin Kapler.

Brent Slater, Esq., Bangor, for Isabel McKay.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

RUDMAN, J.

[¶ 1] In this consolidated appeal, George Kapler appeals from two judgments entered in the Superior Court. George contends that the Superior Court (Penobscot County, *Marsano, J.*) erred when it affirmed a divorce judgment entered in the District Court (Newport, *MacMichael, J.*) and when it granted a summary judgment in favor of Isabel McKay on his trespass claim. We disagree and affirm the judgments.

## I. BACKGROUND

[¶ 2] George and Robin Kapler were married on July 4, 1977. Robin filed for a divorce on April 1, 1996. After a hearing, the District Court granted a divorce judgment on July 29, 1998. The judgment awarded Robin and George shared custody of their four minor children with their primary residence with Robin in Newburgh. After the children were born, Robin primarily became a stay-at-home mother. Currently Robin works as a caterer and as a painter for an independent contractor; she does not receive any health or vacation benefits. George resides in St. Augustine, Florida, where for the past ten years he has owned and operated three residential development corporations. Robin and George each own fifty percent of two of George's corporations, George Kapler Realty and Hairstreak Development Corporation. They also jointly own eighty-five percent of the third corporation, George Kapler Homes.

[¶ 3] During the divorce hearing, much attention was focused on the characterization of a stock portfolio that Robin received, prior to her marriage, as a beneficiary of a trust settled by her grandfather and father. At the time of her marriage, the portfolio had a value of $110,000. Both parties agree that at the time of the divorce hearing the portfolio had a value of $450,000. George challenges the court's award of the increase in the value of the portfolio ($450,000 - $110,000 = $340,000) to Robin.

[¶ 4] The court distributed the couple's marital property in the following manner: The court awarded Robin the stock portfolio (the marital portion of which was valued at $340,000); the marital home in Newburgh ($160,000); a 1993 Ford Aerostar ($5,600); a 1990 Ford Ranger ($3,000); and stumpage from the timber cut on the Newburgh property ($11,276.77). To George, the court awarded George Kapler Realty ($3,200); Hairstreak Development Corporation ($683,000); George Kapler Homes, Inc. (undetermined value); real estate in Hampden ($20,000); a 34' sailboat ($45,000); a 15' 1965 Corson Boat with a 55 horsepower mercury motor and trailer ($2,000); and a life insurance policy ($25,000). The court also ordered George to assume the debt secured by a mortgage on the Newburgh home (-$107,000). Robin's total award equalled $519,876.77 and George's total award equalled $671,200. After an unsuccessful appeal to the Superior Court, George brought this appeal.

**[¶ 5]** George also brought a trespass action in the Superior Court pursuant to 14 M.R.S.A. §§ 7551–B(2) and 7552(4)(B),[1] against Isabel McKay for damages from a timber cut on the Newburgh property.[2] At the time of the cut,

1. We note that even though George brought claims against McKay pursuant to sections 7551–B and 7552, George could only recover pursuant to one of those sections. Section 7552 and 7551–B bar recovery from both sections for the same injury. *See* 14 M.R.S.A. § § 7551–B (5), 7552(8). Section 7551–B provides:

> **1. Prohibition.** A person who intentionally enters the land of another without permission and causes damage to property is liable to the owner in a civil action if the person:
>
> **A.** Damages or throws down any fence, bar or gate; leaves a gate open; breaks glass; damages any road, drainage ditch, culvert, bridge, sign or paint marking; or does other damage to any structure on property not that person's own;
>
> \* \* \* \* \* \*
>
> **2. Liability.** If the damage to the property is caused intentionally, the person is liable to the owner for 2 times the owner's actual damages plus any additional costs recoverable under subsection 3, paragraphs B and C. If the damage to the property is not caused intentionally, the person is liable to the owner for the owner's actual damages plus any additional costs recoverable under subsection 3, paragraphs B and C.

14 M.R.S.A. § 7551–B (Supp.1999). Section 7552 states in pertinent part:

> **2. Prohibitions.** Without permission of the owner a person may not:
>
> **A.** Cut down, destroy, damage or carry away any forest product, ornamental or fruit tree, agricultural product, stones, gravel, ore, goods or property of any kind from land not that person's own; or
>
> \* \* \* \* \* \*
>
> **3. Measure of damages.** This subsection governs the measurement of damages resulting from a violation of subsection 2.
>
> **A.** When agricultural or forest products have been destroyed or carried away, the owner may recover as damages either the value of the lost products themselves or the diminution in value of the real estate as a whole resulting from the violation, whichever is greater.
>
> **B.** For lost trees, the owner may claim in lieu of market value the forfeiture amounts determined in Title 17, section 2510, subsections 2 and 3. In addition, the owner's damages may include the costs for regeneration of the stand in accordance with Title 12, section 8869. The court may reduce the damages awarded for good cause shown when the cutting of trees was done negligently or without fault.
>
> \* \* \* \* \* \*
>
> **4. Damages recoverable.** Damages are recoverable as follows.
>
> **A.** A person who negligently or without fault violates subsection 2 is liable to the owner for 2 times the owner's damages as measured under subsection 3 or $250, whichever is greater.
>
> **B.** A person who intentionally or knowingly violates subsection 2 is liable to the owner for 3 times the owner's damages as measured under subsection 3 or $500, whichever is greater.
>
> **C.** In addition to the damages recoverable under paragraphs A and B, a person who violates subsection 2 is also liable to the owner for the costs the owner may incur if the violation results in a violation of any federal, state or local law or ordinance and, as a result, the owner becomes the subject of an enforcement proceeding. These costs include attorney's fees, costs and the value of the owner's time spent on involvement in the enforcement proceeding.
>
> **5. Costs and fees.** In addition to damages, interest and costs, the owner may also recover from the person who violates subsection 2 the reasonable costs of professional services necessary for determining damages and proving the claim, provided that the person first has written notice or actual knowledge that a claim is being asserted.
>
> \* \* \* \* \* \*
>
> **8. Other actions barred.** A recovery from a defendant under this section bars an action to recover damages under section 7551–B from that defendant for the same specific damage.

14 M.R.S.A. § 7552 (Supp.1998).

2. George additionally based his trespass claim upon 12 M.R.S.A. § 8869. George's reliance on this section is misplaced because individuals do not have the right to enforce section 8869. Subparagraph 10 states:

> **10. Right of enforcement.** Enforcement of this subchapter shall be by any state, county or municipal law enforcement officer, including forest rangers and field foresters of the bureau and wardens of the Department of Inland Fisheries and Wildlife.

12 M.R.S.A. § 8869 (1994 & Supp.1999).

Robin and George owned the Newburgh property as joint tenants. Originally, George and Robin both approached McKay about a timber harvest, but once Robin filed for divorce, George withdrew his consent for the timber cut and notified McKay orally and in writing as to his withdrawal of consent. Robin executed a new contract authorizing McKay to perform the timber cut. The trial court granted a summary judgment in favor of McKay concluding that one joint tenant may authorize a timber cut without exposing the timber cutter to trespass liability.

## II. DISCUSSION

### A. The Divorce Judgment

#### 1. The Award of the Stock Portfolio to Robin Kapler as Nonmarital Property

 [¶ 6] George argues that the District Court erred in classifying all of the stock portfolio as nonmarital property and distributing that amount to Robin. We review the District Court's judgment directly because the Superior Court acted in its appellate capacity. *See Clum v. Graves,* 1999 ME 77, ¶ 9, 729 A.2d 900, 904. We examine the District Court's characterization of marital property for clear error and will affirm the judgment unless no competent record evidence exists to support the characterization. *See id.* Property acquired prior to marriage constitutes nonmarital property, but the increase in the value of that property during the marriage is presumed to be marital property. *See id.*

 [¶ 7] George has misapprehended the District Court's judgment. The District Court found that the shares of stock Robin received from her father and grandfather prior to her marriage were worth $110,000 at the time of the marriage and, therefore, that $110,000 of the shares constituted nonmarital property according to

19–A M.R.S.A. § 953 (1998).[3] The court, however, could not determine what portion of the value of the shares, above the initial $110,000, constituted nonmarital property because Robin did not satisfy her "burden of showing how much is not marital property." Thus, although the District Court's discussion of the shares appears in its written decision under the heading of nonmarital property, the court did not characterize the $340,000 increase in the value of the shares to be nonmarital property. As the court noted, there was insufficient evidence to characterize the increase in the value of shares as nonmarital property. The shares, therefore, were marital property. *See Clum,* ¶ 15, 729 A.2d at 906 (quoting *Harriman v. Harriman,* 1998 ME 108, ¶ 8, 710 A.2d 923, 925, and stating that if a party fails to prove that the increase in the value of the property is nonmarital, the property is properly characterized as marital).

 [¶ 8] We afford the District Court's distribution of marital property wide discretion and review only for abuse of that discretion. *See Robinson v. Robinson,* 2000 ME 101, ¶ 9, 751 A.2d 457, 459. "Absent a violation of some positive rule of law, we will overturn the trial court's decision only if it results in a plain and unmistakable injustice, so apparent that it is instantly visible without argument." *Id.* at ¶ 10, 751 A.2d 457 (internal quotations omitted). The court awarded George $151,323.23 more in marital assets than Robin. If the District Court had awarded George a portion of the stock portfolio, the distribution of the marital assets would have been widely disproportionate. Thus, the District Court did not exceed the bounds of its discretion by awarding Robin the stock portfolio. *See id.*

#### 2. The Valuation of Hairstreak Development Corporation

 [¶ 9] George argues that the court erred in its valuation of Hairstreak.

---

**3.** George does not challenge the court's finding that $110,000 of the stock portfolio is nonmarital property.

We review the District Court's valuation of property for clear error. *See Peters v. Peters,* 697 A.2d 1254, 1258 (Me.1997). The District Court is not bound to accept any evidence as fact and must determine the weight and credibility of all the evidence. *See id.* at 1258–59. Nevertheless, the valuation must reflect "a reasoned evaluation of all the evidence." *Id.* at 1258 (internal quotations omitted).

[¶ 10] The court heard the following evidence before determining the company's value. Both George and his accountant testified that the fifty-seven house lots owned by Hairstreak could be sold for $28,000 each, but that if the whole subdivision was sold together, the lots would be sold at a discounted value. The accountant also testified that in 1997, fourteen lots sold for $28,000 each. Robin's expert, a Florida appraiser, estimated the value of each of Hairstreak's lots to be $30,000 plus an added value for certain lots. The appraiser even testified that there was a shortage of available home lots in the area and that if George had to liquidate the lots they would still sell for $30,000 per lot.

[¶ 11] The court valued the real estate development business by calculating the value of the fifty-seven house lots owned by Hairstreak ($28,000 × 57 = $1,596,000) and subtracting the corporation's liabilities of $913,000.00. George argues that this calculation was erroneous because both he and his accountant testified that this valuation method was improper due to the "volatile real estate market." George, however, does not offer an alternative method of valuation for the fifty-seven house lots the corporation owned; rather, he asserts that the court should have valued the company at $5,962.00 because that was all the money the corporation had at its disposal at the time of the divorce. Such an assertion is ludicrous. The court's valuation of Hairstreak is not erroneous; the valuation reflects a reasoned evaluation of the two competing estimates of lot values and is supported by competent record evidence. *See Peters,* 697 A.2d at 1258–59.

### 3. The Mortgage on the Marital Home in Newburgh

[¶ 12] George argues that the court erred in ordering him to assume the $107,000 debt secured by a mortgage on the Newburgh home because the court awarded Robin nonmarital property, while George received only marital property. Robin asserts that it was equitable for the court to order George to assume the debt because the parties did not have a mortgage on the property until they borrowed $120,000, $78,000 of which went to George's Florida businesses.

[¶ 13] We review the apportionment of marital debt according to the same standard we review the division of marital property—abuse of discretion. *See Findlen v. Findlen,* 1997 ME 130, ¶ 10, 695 A.2d 1216, 1219. Robin testified that prior to marrying George, she took an $8,000 distribution from her trust fund to purchase a home in Winterport. After their marriage, Robin and George sold the Winterport house and used the proceeds from the sale, along with money George contributed, to buy the Newburgh home. The couple purchased the Newburgh home without financing. The property became encumbered later, when the couple borrowed $120,000.

[¶ 14] George does not present any evidence—nor does the record contain any evidence—to establish that the court's award was unjust. Even with George assuming the $107,000 debt, he still received over $150,000 more of the marital property than Robin. There being no error or abuse of discretion, we affirm the judgment.

### B. The Trespass Claims

[¶ 15] George asserts that a summary judgment was inappropriate because a genuine issue of material fact exists regarding whether McKay committed a tres-

pass pursuant to 14 M.R.S.A. § 7551–B(2) (Supp.1999) or 14 M.R.S.A. § 7552 (1980 & Supp.1998), and because the Superior Court erred in finding that as a matter of law McKay is not liable to George for trespass. McKay maintains that the court properly granted a summary judgment because there are no genuine issues of material fact and as a matter of law, she did not trespass upon the Newburgh property.

[¶ 16] We review the grant of a summary judgment for errors of law and independently examine the record to determine if a genuine issue of material fact exists. *See Nevin v. Union Trust Company*, 1999 ME 47, ¶ 5, 726 A.2d 694, 696. We view the evidence in "a light most favorable to the party against whom the judgment has been granted." *Id.* In this case, no genuine issues of material fact exist because the parties do not dispute that Robin Kapler authorized McKay to harvest wood on the Newburgh property.

[¶ 17] We, · therefore, address solely an issue of law: whether a third person must obtain the consent of all joint owners before she can enter the land to harvest wood, or may rely upon the authority of one owner, without risk of violat-

ing sections 7551–B(2) or 7552.[4] This question is best answered by interpreting the term *the owner* as employed in sections 7551–B and 7552. "The fundamental rule in statutory construction is that words must be given their plain ordinary meaning." *See Estate of Spear*, 1997 ME 15, ¶ 7, 689 A.2d 590, 591. We will not look beyond the plain meaning of the statute unless the result would be illogical or absurd. *See id.* at 592. It is logical to interpret *the owner* language in sections 7551–B and 7552 as *any owner* because the statute does not require the permission of *all owners*. A holding to the contrary would create a logistical nightmare of requiring all co-owners (whether there are two or two-hundred and two) to grant permission before a third-party can enter upon the land risk-free. As *an owner*, Robin's permission satisfies the requirements of section 7551–B or 7552.

[¶ 18] Title 14, section 7505,[5] provides further support for our conclusion. *See* 14 M.R.S.A. § 7505 (1980). Section 7505 explicitly addresses the situation before us today where a co-owner authorized a wood harvest without notifying the other joint tenant. *See id.* Section 7505 provides a remedy between those co-owners

---

4. We addressed a similar issue in 1895 in *Hazen v. Wight*, 87 Me. 233, 32 A. 887, 888 (1895). In that case, a tenant in common brought a common law trespass action against a third-party who carried away timber under the authorization of another tenant in common. *See Hazen*, 32 A. at 888. The third-party provided the same defense as Isabel McKay—that the third-party had the authority of one of the co-owners. *See id.* The Court, however, found that because the co-owner did not comply with a statute, R.S. ch. 95, § 5, that required a co-tenant to give fellow co-tenants thirty-days written notice before timbering the land, the co-tenant did not have the authority to give the third-party permission to cut the timber and, therefore, the third-party's defense—that it had the permission of one co-tenant—was invalid. *See id.* We decline to follow *Hazen* as the question before us is truly one of statutory construction, while the *Hazen* Court interpreted the common law.

5. Section 7505 states in its entirety:

If any joint tenant or tenant in common of undivided lands cuts down, destroys or carries away trees, timber, wood or underwood, standing or lying on such lands, or digs up or carries away ore, stone or other valuable thing found thereon, or commits strip or waste, without first giving 30 days' notice in writing under his hand to all other persons or to their agents or attorneys, and to mortgagors and mortgagees if any there are interested therein, of his intention to enter upon and improve the land; which notice to such persons interested as are unknown, or whose residence is unknown or who are out of the State may be published in the state paper 3 times, the first publication to be 40 days before such entry; or if he does any such acts pending a process for partition of the premises, he shall forfeit 3 times the amount of damages. Any one or more of the co-tenants, without naming the others, may sue for and recover their proportion of such damages.
14 M.R.S.A. § 7505 (1980).

by making the co-owner liable for failing to notify her co-tenant of her intended conduct. *See id.* Although the legislative history does not reveal any legislative intent, it appears that section 7505 was intended to provide a cause of action directly between co-owners and to avoid suits such as this which allow a co-owner to sue an innocent agent who relied on the authority of another co-owner. *See* 14 M.R.S.A. § 7505.

[¶ 19] Additionally, section 7505 does not deprive Robin of her right, as a joint tenant with ownership of, and a right to possess, the undivided whole of the parcel, to effectively authorize McKay to harvest the property without notifying her other co-tenants. *See Poulson v. Poulson,* 145 Me. 15, 18, 70 A.2d 868, 869 (1950) (noting that a joint tenant owns and possesses undivided whole of land). George might have brought an action against Robin for harvesting the land without providing him thirty-days written notice.[6] Imposing liability upon McKay, however, would give George the opportunity to recover from both Robin and McKay for the same injury even though section 7505 specifically provides George with redress solely from Robin. We cannot endorse such a result.

The entry is:

Judgments affirmed.

---

6. It is worth noting that even if the Superior Court found Isabel liable under either 7551–B or 7552, Isabel may have an indemnification claim against Robin pursuant to common law agency principles. *See* Restatement (Second) of Agency § 439(c), cmt. g (stating that "a principal who reasonably believes that he is entitled to the possession of land or chattels is under a duty of indemnity to an agent who innocently obeys orders in taking possession and is made liable for trespass or conversion to the one entitled to possession"). This possibility of indemnity bolsters the argument that a section 7505 suit against Robin—and not a section 7551–B or 7552 suit against Isabel—was the proper remedy for George. Section 7505 efficiently resolves this situation by eliminating the common law hoops of requiring George to sue Isabel and thereby requiring Isabel to sue Robin for indemnity. Section 7505 allows George to directly sue Robin instead.