2002 ME 156

**Barbara WARNER**

v.

**Barry WARNER.**

Supreme Judicial Court of Maine.

Argued: May 9, 2002.
Decided: Oct. 3, 2002.

Gene R. Libby, Esq., Verrill & Dana, LLP, Kennebunk, for plaintiff.

Jonathan C. Hull, Esq., Damariscotta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Barry Warner appeals from a divorce judgment by the Superior Court (Lincoln County, *Mills, C.J.*). His principal contentions are that the court erred in: (1) granting Barbara Warner a divorce on the ground of adultery and permitting the finding of adultery to influence its distribution of marital property and its discretionary trial rulings; (2) treating all of the securities which make up his stock portfolio as marital property; (3) awarding Barbara monthly spousal support in the amount of $1000 per month until December 30, 2009, that then increases to $2000 per month and cannot be decreased thereafter; (4) requiring him to maintain a $300,000 life insurance policy or other security to secure the payment of spousal support; and (5) awarding Barbara $35,000 in attorney fees.[1] We affirm the judgment's award of a divorce to the parties, but otherwise vacate the judgment's property, spousal support, and attorney fees awards.

## I. CASE HISTORY

[¶ 2] Barry and Barbara Warner were married in 1965 and through most of their marriage resided together in Maine until their separation in 1999. They have one adult son. The court determined that Barbara's expected annual income from all sources is $32,022 as follows: $15,000 from her part-time work as a massage therapist; $15,149 in income from J.B.B., Inc., a corporation established by the parties during their marriage which owns and leases real estate; and $1873 rental income from a condominium in Florida, which she inherited from her father. Barry was determined to have an expected annual income of $65,500 from the following sources: annual distributions totalling $25,000 from the Robert Lyon Warner Trust of which he is a beneficiary; investment income of $34,500 based upon an estimated 6% return on his stock portfolio valued at $575,000; and $6000 in wages from part-time employment. Both parties were age fifty-nine at the time of the divorce hearing.

[¶ 3] In 1963, prior to the marriage, Barry inherited stocks and bonds then worth approximately $215,000. In December 1966, after the parties married, Barry inherited additional securities. His total stock portfolio was worth approximately $290,000 as of January 1967. In 1992, Barry received an additional distribution of stocks worth approximately $94,000 by the Putnam Trust from his father's estate. The court determined that the total value of Barry's stock portfolio as of April 30, 2001, was $545,977.

[¶ 4] The stocks and bonds inherited by Barry prior to and during the marriage were held solely in his name throughout the marriage. All of the stocks and bonds he inherited in 1963 and 1966 have been sold or otherwise transferred, and none of the stocks and bonds Barry currently owns are the same as those he inherited in 1963 and 1966. Because of poor record-keeping, it was not possible for Barry or his expert accounting witness to trace the proceeds of the sales of the securities received in 1963 and 1966 to the current stock portfolio. The earliest date of acquisition of any of the thirty-seven individual securities owned by Barry as of the divorce hearing was June of 1982.

1. Barry raises additional issues that we find to be without merit and do not address.

[¶ 5] The marital property included residences in Bristol, Maine, and Boulder, Colorado, and commercial real estate in Damariscotta, Maine. The parties had originally operated a motorcycle, snowmobile, and automobile repair and sales business with a gasoline station on the Damariscotta property. After the sales and repair portion of the business was destroyed by fire in 1984, the parties discontinued their business operations and began leasing the property. The corporation that they formed to own the property, J.B.B., Inc., currently produces a net income of approximately $15,000 a year.

[¶ 6] Each party had individual retirement accounts, and the parties also owned significant personal property, including many antique motorcycles. The only substantial disputes regarding marital versus nonmarital property concerned (1) the stock portfolio managed by Barry that Barbara claimed was marital property, and (2) the Florida condominium owned by Barbara that Barry claimed was marital property.

[¶ 7] The court granted a divorce to Barbara on the ground of adultery and to Barry on the ground of irreconcilable marital differences. The court determined that the Florida condominium inherited by Barbara from her father, valued at $40,000, was nonmarital property and set it apart to her. It also determined that the entire stock portfolio was marital property and awarded it to Barry. Barry was awarded marital property worth $819,887, including the stock portfolio valued at $545,977, and Barbara was awarded marital property worth $746,785. There is no significant contest regarding the values the court assigned to the marital property. In finding the entire stock portfolio owned by Barry to be marital property, the court reasoned that: (1) the stocks were acquired during the marriage; (2) they could not be traced back to proceeds from stocks acquired prior to the marriage; (3) Barry failed to prove that marital funds were not invested in the current portfolio; and (4) Barry "had a substantial active role during the marriage in managing, preserving or improving the property."

[¶ 8] The court's distributive award of marital and nonmarital property is summarized as follows:

## DISTRIBUTION OF ASSETS AND DEBTS TO BARBARA

|  | Asset Value | Debt Owed | Net Asset Value |
|---|---|---|---|
| **Marital Assets** | | | |
| Bristol, Me., residence | $225,000 | | $225,000 |
| J.B.B., Inc. | $433,000 | $6928 | $426,072 |
| Vehicle and personal property | | | $ 22,560 |
| IRAs | | | $ 71,654 |
| Bank and related financial accounts | | | $ 1499 |
| TOTAL MARITAL NET WORTH | | | $746,785 |
| **Nonmarital Assets** | | | |
| Florida condominium | | | $ 40,000 |
| Personal property | | | $ 8450 |
| Savings account | | | $ 2000 |
| TOTAL NONMARITAL NET WORTH | | | $ 50,450 |

## DISTRIBUTION OF ASSETS AND DEBTS TO BARRY

|  | Asset Value | Debt Owed | Net Asset Value |
|---|---|---|---|
| **Marital Assets** |  |  |  |
| Boulder, Co., residence (2/3rds interest) | $339,000 [2] | $129,722 | $139,518 |
| Damariscotta, Me., parcel |  |  | $ 11,000 |
| Vehicles and personal property |  |  | $ 41,130 |
| IRAs |  |  | $ 66,387 |
| Bank and related financial accounts |  |  | $ 15,875 |
| Stock portfolio |  |  | $545,977 |
| TOTAL MARITAL NET WORTH |  |  | $819,887 |
| **Nonmarital Assets** |  |  |  |
| Personal property |  |  | $ 33,150 |
| TOTAL NONMARITAL NET WORTH |  |  | $ 33,150 |

[¶ 9] With its allocation of property, the court determined that Barbara would have a projected annual income of approximately $32,000 and that Barry would have a projected annual income of approximately $65,000. Based primarily on the differences in the parties' projected incomes, Barbara's health problems, and the standard of living achieved during the marriage, the court awarded Barbara spousal support in the amount of $1000 per month until December 30, 2009, that then increases to $2000 per month, and that the "amount and term of support to be paid after 12/30/99 cannot be decreased." [3] The court further specified that (1) the spousal support award would not terminate on Barry's death or on Barbara's remarriage or cohabitation, and (2) Barry must maintain a $300,000 life insurance policy, with Barbara as the sole beneficiary, or provide other security acceptable to Barbara and her counsel to secure the payment of the spousal support. The court also awarded Barbara $35,000 toward her attorney fees.

[¶ 10] After the initial judgment, Barry filed two motions to reconsider. In response to these motions, the court clarified certain findings and made additional findings regarding the Putnam Trust stocks, the Robert Lyon Warner Trust and Barry's anticipated income. It also clarified that the award of spousal support would terminate on Barbara's death. After the rulings on the motions to reconsider, Barry brought this appeal.

## II. DISCUSSION OF ISSUES

### A. Grounds for Divorce

■■■ [¶ 11] On Barbara's complaint and Barry's counterclaim for divorce, a divorce was granted to Barbara on the

---

**2.** The parties' son owns a one-third interest in the Boulder residence. The record suggests that both parties valued the Boulder residence at $330,000, not $339,000 as found by the court. *See* Plaintiff's Ex. 16. Upon remand, the court will have the opportunity to determine which of the two values is correct.

**3.** The court found in connection with this increase that Barry, as a beneficiary of the Robert Lyon Warner Trust that was worth $7,487,509.67 in 1999, will receive a distribution of 20% of the trust in 2009.

ground of adultery, 19–A M.R.S.A. § 902(1)(A) (1998), and to Barry on the ground of irreconcilable marital differences, 19–A M.R.S.A. § 902(1)(H) (1998). Both grounds are authorized by statute and were supported by the evidence. Barry contends that the adultery finding supports his contention that the trial court committed error by using fault to affect its decision regarding distribution of the marital property. However, there is no indication in the court's judgment that it considered fault in its division of marital property, and the judgment reflects that the court sought to make an equitable distribution of the property it had determined to be marital property.

■ [¶ 12] Barry also asserts that the court's finding of fault affected its findings and discretionary rulings by favoring Barbara. As with the complaint regarding the allocation of the marital property, there is nothing in the court's decision or otherwise in the record to support this claim. Certainly, the court made rulings and factual findings with which reasonable parties can disagree. Courts necessarily must make such findings in contested cases. However, the findings the court made are consistent with the record. They demonstrate no bias against Barry and reflect an effort to achieve a near equal division of marital property and a responsible arrangement for spousal support. The claims regarding use of fault in the court's decision-making are unsupported by the text of the court's decision or by a reasonable review of the record.[4]

B. The Stock Portfolio

[¶ 13] For the great bulk of the stock portfolio, there can be no serious dispute that the property was acquired during the marriage and was properly determined by the court to be marital property pursuant to 19–A M.R.S.A. § 953(3) (1998). All of the evidence indicated that the stock that Barry acquired prior to the marriage, or shortly after the marriage, was sold. There is, however, no "paper trail" establishing that the current holdings in the portfolio were acquired with proceeds from the sale of the securities Barry inherited before and shortly after the parties' marriage in 1965. Therefore, apart from the Putnam Trust stocks inherited by Barry in 1992, there is no basis to claim that either the portfolio or its increases in value during the marriage are nonmarital property. The presumption that these stocks, acquired during the marriage, are marital property was not rebutted. *See* 19–A M.R.S.A. § 953(3).

C. The Putnam Trust Stocks

[¶ 14] The trial record establishes without contradiction that on December 21, 1992, Barry received ownership of seven individual stocks "that were released from a trust that had been set up by Mr. Warner's grandfather and his first wife.... The term Putnam dealt with the trustee at the time...."[5] The court specifically found that "[i]n 1992, the defendant received an additional inheritance of invest-

---

4. We also reject Barry's claim that the court erred by failing to accept his defense of condonation to Barbara's claim of adultery. The court correctly noted that condonation is not an absolute defense and is merely a factor to be considered in determining whether adultery has been established. *See Schneider v. Richardson,* 438 A.2d 896, 898 (Me.1981).

5. This testimony was provided by Scott Adams, an attorney and certified public accountant, who examined all of Barry's records pertaining to the securities and testified as an expert witness. Barry also testified that he received the seven Putnam Trust stocks as "an inheritance."

ments with a total value of approximately $94,000.00." [6]

[¶ 15] Following Barry's acquisition of these securities in 1992, he sold all of his shares of three of the seven Putnam Trust stocks, and no evidence was introduced that would have enabled the court to trace the proceeds from these sales. The uncontradicted evidence demonstrates the following post-acquisition activity for the remaining four Putnam Trust stocks: [7]

1. Exxon

| | |
|---|---|
| 582 Shares | Inherited in 1992 |
| <100> Shares | Shares sold in 1995 |
| 2/1 Split | 1997 |
| <200> Shares | Shares sold in 1998 |
| <100> Shares | Shares sold in 1999 |

664 Shares Currently Owned

2. General Electric

| | |
|---|---|
| 132 Shares | Inherited in 1992 |
| 2/1 Split | 1994 |
| 2/1 Split | 1997 |
| <100> Shares | Shares sold in 1998 |

428 Shares Currently Owned

3. Proctor & Gamble

| | |
|---|---|
| 264 Shares | Inherited in 1992 |
| 5.190 Shares | Dividend Reinvestment |
| 2/1 Split | 1997 |
| <48> Shares | Shares gifted in 1997 |
| 11.506 Shares | Dividend Reinvestment |

501.886 Shares Currently Owned

6. The number of shares and values of the seven Putnam Trust stocks are reflected in a 1992 year-end listing of stocks and securities that was received in evidence:

| Stock | Price | Shares | Value |
|---|---|---|---|
| Amer. Home Prod. | $67.50 | 165 | $11,138 |
| Block H R | $39.75 | 165 | $ 6559 |
| Exxon | $61.13 | 582 | $35,575 |
| General Electric | $85.50 | 132 | $11,286 |
| Philip Morris | $77.13 | 81 | $ 6247 |
| Proctor & Gamble | $52.63 | 264 | $14,157 |
| Union Pacific | $58.50 | 165 | $ 9653 |
| Total | | | $94,615 |

7. This history is based on the report, testimony, and work papers of Scott Adams. Adams traced the Putnam Trust stocks from their date of acquisition to the present. Contrary to the trial court's finding that "the foundation for Mr. Adams's opinion was a history provided by the defendant," Adams also analyzed voluminous account statements, correspondence, confirmation statements, journal entries, tax returns, and other documents pertaining to the Warner securities for the period 1965 to 2000. Barbara also offered a certified public accountant, Eric Purvis, as an expert witness who testified regarding the Warners' securities. Although Purvis disputed Adams's analysis regarding most of the Warners' investment portfolio, he offered no specific testimony or opinions regarding the Putnam Trust stocks.

4. Union Pacific

| | |
|---|---|
| 165 Shares | Inherited in 1992 |
| 50 Shares | Purchased in 1999 |

215 Shares Currently Owned

[¶ 16] Apart from the purchase of fifty additional shares of Union Pacific stock in 1999, none of the shares of these four stocks were acquired by any method other than Barry's 1992 inheritance, subsequent stock splits and, in the case of Proctor & Gamble, dividend reinvestment. Both Barbara and her expert witness, a certified public accountant, offered no testimony or opinions regarding the Putnam Trust stocks. The court was not faced with choosing between two contradictory theories regarding the source of acquisition of the Exxon, General Electric, Proctor & Gamble, and Union Pacific stocks in the Warner portfolio as of the divorce trial.

■ [¶ 17] Notwithstanding the detailed and uncontradicted information introduced with respect to the Putnam Trust stocks, the divorce judgment does not address these stocks separate from its more general discussion of Barry's overall stock portfolio. Although the court identified gaps in the evidence regarding the acquisition of the parties' securities as the basis for its conclusion that the entire portfolio was marital property, none of the gaps identified by the court pertain to the Putnam Trust stocks. The court ultimately concluded:

> All of the securities in the current portfolio were purchased during the marriage. The defendant has failed to demonstrate that marital funds were not invested in the currently held portfolio. See [19–A M.R.S.A.] § 953(2)(E)(1)(a) & (3) (1998 & Supp.2000). Further, the defendant had a substantial active role during the marriage in managing, preserving, or improving the property. See id. § 953(2)(E)(1)(b) & (2)(c). The stock portfolio is marital property and is

awarded to the defendant as his exclusive property, subject to any encumbrances, which he will pay and will hold the plaintiff harmless therefrom.

[¶ 18] In responding to Barry's post-judgment motion for reconsideration and, in particular, the judgment's treatment of the Putnam Trust stocks as marital property, the court made the following specific finding:

> The court relies on the language in the Divorce Judgment regarding the stock portfolio. The defendant's testimony was, in large part, rejected by the court as not credible. Further, a substantial active role in management of a portfolio is not disproved by a lack of trading activity in a particular investment.

[¶ 19] Barry argues that because the court received evidence specific to the four remaining Putnam Trust stocks, it should have considered the post-acquisition history of each stock and not limited its analysis to the entire Warner stock portfolio as a whole. We agree.

■ [¶ 20] Publicly traded securities are a species of property that generally require individual analysis under Maine's marital property statute. *See, e.g., Clum v. Graves,* 1999 ME 77, ¶ 14, 729 A.2d 900, 906 (discussing the securities that comprise the portfolio); *Harriman v. Harriman,* 1998 ME 108, ¶¶ 1–2, 710 A.2d 923–24 (listing individual stocks). A "portfolio" is not a species of property unless the evidence regarding the portfolio fails to reasonably permit the trial court to identify and distinguish the various investments comprising it.[8] It is not sufficient for a

---

8. As used in connection with investments, "portfolio" refers to "all of the securities held

divorce court to limit its analysis under 19–A M.R.S.A. § 953 to a stock portfolio as a whole when it has before it discrete information that reasonably permits an assessment of some or all of the individual securities that comprise the portfolio.[9]

[¶ 21] Here, the court had before it detailed information pertaining to the acquisition and subsequent history of the four Putnam Trust stocks inherited by Barry in 1992 that he still owned at the time of the divorce hearing. In addition, Adams testified at length regarding his tracing and evaluation of each of these stocks. Although it would have been very helpful in this complicated case for Barry to have offered an illustrative aid, see M.R. Evid. 616, or summary exhibit, see M.R. Evid. 1006, that graphically segregated the Putnam Trust stocks from the rest of the Warners' portfolio, Adams's testimony and, in particular, his working papers received in evidence, provided a clear picture and history of each stock.[10] The court's finding that the Putnam Trust stocks were inherited in 1992 with a value of $94,000 reflects that it was cognizant of the evidence specific to the Putnam Trust stocks. Its failure to analyze those stocks separate from the Warners' overall portfolio, however, resulted in its erroneous conclusion

that "all of the securities in the current portfolio were purchased during the marriage." This conclusion directly conflicts with its separate finding that Barry "inherited" the Putnam Trust stocks in 1992.

### 1. Marital Property Presumption

■ [¶ 22] The analysis of the evidence pertaining to the Putnam Trust stocks begins with the application of the marital property presumption. 19–A M.R.S.A. § 953(3). Because the stocks were acquired during the marriage, the stocks are presumptively marital property. Section 953(3) directs that "[t]he presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2." *Id.* The next step, therefore, is to determine whether, by a preponderance, the evidence establishes any of the five statutory exceptions for overcoming the marital property presumption set forth in section 953(2)(A)-(E). 19–A M.R.S.A. § 953(2)(A)-(E) (1998 & Supp.2001). One of the methods of acquisition listed in section 953(2) is bequests. *Id.* § 953(2)(A) (1998). Here, the divorce court found that the Putnam Trust stocks were acquired by a bequest when it concluded that they were inherited by Barry

for investment by an individual, bank, investment company, etc." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1122 (Michael Agnes ed., 4th ed.1999).

9.  In addition to the four Putnam Trust stocks, the Warners owned a total of thirty-three stocks and mutual funds at the time of the divorce trial, not including any stocks or mutual funds held in their IRA accounts.

10.  The difficulty faced by the court in distinguishing the history of the Putnam Trust stocks from the remainder of Barry's portfolio began with Barry's failure to address the issue, other than a cursory mention, in his pretrial memorandum. The difficulty was then compounded by Barry's trial strategy of treating his entire stock portfolio as nonmari-

tal property, notwithstanding the absence of the documentary evidence needed to adequately trace the acquisition history of most of the securities. This required the court to analyze a thirty-eight year history of numerous stock trades and the opening and closing of several brokerage accounts, based in large measure upon piecemeal information. When a party fails to adequately organize the presentation of evidence of complicated and lengthy financial transactions, the court may consider requiring the party to prepare and submit illustrative aids, summary exhibits and other testimonial aids "so as to (1) make the interrogation and presentation [of evidence] effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time. ..." M.R. Evid. 611(a).

in 1992. This finding is sufficient to overcome the marital property presumption.

■ [¶ 23] Having determined that the property was acquired by a method that is an exception to the marital property presumption, the court must next determine whether the shares of stock currently owned are the same as those acquired by a bequest. This is relatively simple with respect to the Union Pacific stock because the number of shares currently owned were not affected by any sales, gifts, or dividend reinvestment but only by a separate purchase of fifty additional shares. The fifty additional shares fall squarely within the marital property presumption and were properly treated as such by the court. The acquisition of fifty additional shares does not, however, affect the nonmarital character of the 165 inherited shares.

[¶ 24] The analysis is only slightly more complicated with respect to the remaining three securities: Exxon, General Electric, and Proctor & Gamble. The number of shares of Exxon, General Electric, and Proctor & Gamble stock currently owned by Barry are greater than those acquired in 1992 as a result of either stock splits or dividend reinvestment.

### 2. Stock Splits

■ [¶ 25] A stock split is defined as "[t]he issuance of two or more new shares in exchange for each old share without changing the proportional ownership interests of each shareholder." BLACK'S LAW DICTIONARY 1432 (7th ed.1999). It does not constitute income to the owner of the stock, nor does it generate an increase in the investment's value. The fact that the number of shares of Exxon, General Electric, and Proctor & Gamble stock increased following their acquisition due to stock splits is a neutral event with respect to the application of Maine's marital property statute.

### 3. Dividend Reinvestment

■ [¶ 26] The increase in the number of shares of stock resulting from dividend reinvestment—here, 16.696 shares of Proctor & Gamble stock—is generally also a neutral event for purposes of applying Maine's marital property statute to shares of stock acquired by one of the methods listed in section 953(2)(A)-(E). The income reflected in the dividend of a publicly traded security is the product of the company's financial performance, not the effort or contributions of either or both spouses. A spouse's decision to have dividends reinvested in the stock, rather than paid as cash, is a routine investment decision that does not transform the inherited shares of stock responsible for the reinvested dividends into marital property. In addition, as is considered in greater detail below, the new shares acquired through "reinvested income" are also nonmarital property "unless either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property." 19–A M.R.S.A. § 953(2)(E)(1)(b) (Supp.2001).

### 4. Market Appreciation

■ [¶ 27] As publicly traded securities, any increase in the market value of the shares of Exxon, General Electric, Proctor & Gamble, and Union Pacific during the marriage was the product of market forces, not Barry's marital effort. The increase in value of a nonmarital asset resulting strictly from market forces has generally been treated as also constituting nonmarital property. *See, e.g., Clum,* 1999 ME 77, ¶ 13, 729 A.2d at 906 (explaining that "[i]f the appreciation occurs because of increases in market value, the appreciation remains nonmarital property.");

*Nordberg v. Nordberg,* 658 A.2d 217, 219 (Me.1995) (finding nonmarital funds at issue remained nonmarital despite increase in value of funds due to fluctuations in the market during course of marriage); *Macdonald v. Macdonald,* 532 A.2d 1046, 1050 (Me.1987) (stating that the "increase in value ... attributable to the inherent value of the property and the economic factors affecting it" is nonmarital property). This view is now codified in section 953(2)(E), which expressly establishes "[t]he increase in value of a spouse's nonmarital property" as an exception to marital property, and section 953(2)(E)(1)(a), which further provides that " '[i]ncrease in value' includes ... [a]ppreciation resulting from market forces." 19–A M.R.S.A. § 953(2)(E)(1)(a) (Supp.2001). Thus, the increase in value of the shares of the Putnam Trust stocks resulting from market appreciation is nonmarital property.

### 5. Substantial Active Role in Managing, Preserving, or Improving Property

■ [¶ 28] The final step in the analysis of the four remaining Putnam Trust stocks is to consider the application of section 953(2)(E)(1)-(2).[11] The divorce court concluded that all increases in the value of the Warners' stock portfolio, which includes the four remaining Putnam Trust stocks, were entirely marital proper-

ty, in part because Barry played "a substantial active role during the marriage in managing, preserving, or improving the property." It further concluded with respect to the Putnam Trust stocks that "a substantial active role in management of a portfolio is not disproved by a lack of trading activity in a particular investment." In reaching these conclusions, the court misconstrued section 953(2)(E)(1)-(2).

[¶ 29] In 2000, the Maine Legislature revised the marital property statute as it pertains to the treatment of the increase in value of nonmarital property during marriage in response to our decisions in *Clum v. Graves,* 1999 ME 77, 729 A.2d 900, and *Harriman v. Harriman,* 1998 ME 108, 710 A.2d 923. *See* P.L.1999, ch. 665, § 1 (effective August 11, 2000). In *Clum* and *Harriman,* we treated the portion of the increased value of nonmarital investment assets resulting from both market appreciation and the reinvestment of income such as dividends and capital gains as marital property. *Clum,* 1999 ME at 77, ¶ 15, 729 A.2d at 906; *Harriman,* 1998 ME 108, ¶ 8, 710 A.2d at 924–25. In so ruling, we focused upon the well-established principle that the party asserting that the increase in value of an otherwise nonmarital asset is also nonmarital property has the burden of

---

**11.** This section provides:

**2. Definition.** For purposes of this section, "marital property" means all property acquired by either spouse subsequent to the marriage, except:

. . . .

E. The increase in value of property acquired prior to the marriage and the increase in value of a spouse's nonmarital property as defined in paragraphs A to D.
(1) "Increase in value" includes:
(a) Appreciation resulting from market forces; and
(b) Appreciation resulting from reinvested income and capital gain unless either

or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.
(2) "Increase in value" does not include:
(a) Appreciation resulting from the investment of marital funds or property in the nonmarital property;
(b) Appreciation resulting from marital labor; and
(c) Appreciation resulting from reinvested income and capital gain if either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.
19–A M.R.S.A. § 953(2)(E)(1)-(2) (Supp.2001).

proving the same. *See Kapler v. Kapler*, 2000 ME 131, ¶ 7, 755 A.2d 502, 506.

[¶ 30] At the time *Clum* and *Harriman* were decided, section 953(2)(E) of the marital property statute provided, in pertinent part, that " 'marital property' means all property acquired by either spouse subsequent to the marriage, except: ... **E.** The increase in value of property acquired prior to marriage." 19–A M.R.S.A. § 953(2)(E) (1998). In both *Clum* and *Harriman* the party claiming that the increase in value was nonmarital property failed to meet its burden of proof by failing to introduce evidence from which the court could distinguish (1) the increased value of a stock or mutual fund resulting from market forces, from (2) the increased value of a stock or mutual fund resulting from the reinvestment of income through reinvested dividends or capital gains. We therefore concluded that all of the increases in value should be treated as marital property in accordance with the marital property presumption, 19–A M.R.S.A. § 953(3).

[¶ 31] In response to these holdings, section 953(2)(E) (1998) was amended by the Legislature.[12] *See* 19–A M.R.S.A.

---

12. The Maine Family Law Advisory Commission authored the statutory revision and submitted the following "comment" in support of it:

> This revision of 19–A M.R.S.A. § 953(2)(E), prepared in response to the decisions of *Clum v. Graves*, 1999 ME 77, 729 A.2d 900, and *Harriman v. Harriman*, 710 A.2d 923, 1998 ME 108, makes two changes to the operation of Maine's marital property law.
>
> First, it excludes the increase in value of non-marital property from the definition of marital property if no marital effort or money is expended. The portion of the increase resulting from the reinvestment of the property's income or appreciation during the marriage remains non-marital, so long as neither spouse had a substantial and active role in the management, preservation or improvement of the property during the marriage. For example, if dividends, interest or capital gains are routinely reinvested in a spouse's non-marital retirement, investment, savings or other financial account, the resulting increase in value remains non-marital property. On the other hand, if funds invested in a spouse's non-marital account involved the substantial active involvement of either or both spouses, the increase in value may be found to be marital property. The determination of what constitutes "substantial and active" involvement by a spouse will depend upon the type of management, maintenance or improvement customarily associated with the type of property at issue.
>
> A spouse's active and substantial involvement does not depend upon whether the spouse received compensation for her or his efforts. A spouse's active, but uncompensated time spent managing his or her premarital stock portfolio during the marriage is marital effort and any increase in the value of the portfolio flowing from reinvested income will be treated as marital property. Similarly, the increase in value of a non-marital business during marriage resulting from reinvesting the business' income in the business will also be treated as marital property if either or both spouses actively managed the business during the marriage. *See, e.g., MacDonald v. MacDonald*, 582 A.2d 976 (Me.1990). Nominal, inconsequential or sporadic actions by a spouse in connection with non-marital property will not cause the increase in value of the property attributable to reinvested income to be treated as marital property. *See, e.g., Nordberg v. Nordberg*, 658 A.2d 217 (Me.1995).
>
> This provision also does not require proof that a spouse's active and substantial involvement in the asset's management, preservation or improvement was directly responsible for the income generated by a non-marital asset. It is a spouse's dedication of time and skills to the property during the marriage which brings the property's income within the ambit of the marriage's "shared enterprise." It is not necessary to prove that the spouse's involvement was responsible for the income produced by the property.
>
> The second change made by the amendment is to expand the exception to the marital property presumption to include non-

§ 953(2)(E)(1)-(2) (Supp.2001). Revised section 953(2)(E)(1)(a) establishes that to the extent a party demonstrates that the increase in value of a spouse's nonmarital stock resulted from "market forces," the increased value is nonmarital property regardless of whether the spouse or spouses played a substantial active role in managing the stock. In addition, sections 953(2)(E)(1)(b) and (2)(c) establish that to the extent a party demonstrates that the increase in value of a spouse's nonmarital stock resulted from reinvested income and capital gain, the increased value is nonmarital property unless it is also established that "either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property."[13]    19–A    M.R.S.A. § 953(2)(E)(1)(b) & (2)(c) (Supp.2001).

■ [¶ 32] In this case, the "increase in value" of the four remaining Putnam Trust stocks, as distinguished from the Warners' portfolio as a whole, must be analyzed

pursuant to section 953(2)(E)(1) and (2). It is not sufficient to conclude that, overall, a spouse was substantially and actively involved in the management of a couple's investment portfolio and that, *a fortiori*, the same is true for each investment within the portfolio. Section 953(2)(E)(1)(b) and (2)(c) is focused upon a spouse's "substantial active role ... in managing, preserving or improving *the property*" and not, more generally, upon all property of the same type or character. *Id.* § 953(2)(E)(1)(b) & (2)(c) (emphasis added). In addition, pursuant to section 953(2)(E)(1)(b) and (2)(c), the question of whether Barry had a substantial active role in managing the Putnam Trust stocks only applies to the shares of stock acquired with reinvested income and does not apply to increases in the value of the stocks resulting from market forces.

■ [¶ 33] Although the record supports the court's finding that Barry "had and continues to have a substantial active

---

marital property acquired during the marriage. The predecessor provision only applied to the "increase in value of property acquired prior to the marriage." (Emphasis added.) This amendment removes this limiting language so that it now applies to all non-marital property, whether acquired prior to marriage or during the marriage (through gift, bequest, devise, or decent [sic]) or property excluded by agreement of the parties.

The amendment does not address situations in which spouses rely exclusively on their marital funds during the marriage so as to preserve either or both spouse's premarital investment, retirement or similar accounts. The Courts can achieve an equitable distribution in such circumstances through the provisions of 19–A M.R.S.A. § 953(B) (the court must consider the value of the non-marital property set apart to each spouse in arriving at an equitable distribution), as well as through an award of reimbursement spousal support statute. See L.D. 2276 (proposed 19–A M.R.S.A. § 951–A(2)(C)).

Maine Family Law Advisory Commission, Recommendation to the Maine Legislature, Joint Standing Committee on the Judiciary, Regarding L.D. 2267 cmt. 1–3 (Feb. 23, 2000) [hereinafter FLAC Recommendation].

13. The approach employed in *Clum* and *Harriman* generally mandated the use of an expert witness to analyze each investment and distinguish increases in value resulting from market forces, from increases in value resulting from reinvested income and capital gain. The revision of section 953(2)(E) may reduce the frequency with which expert testimony is required because the expertise required to parse the appreciation history of stocks or other publicly traded securities is no longer central to the court's inquiry. Expert testimony may continue to be necessary, however, in those instances where the court determines that "either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property" or when a particular investment was acquired with both marital and nonmarital funds.

role in managing [his] investments," [14] the only evidence specific to any action taken by him over a nine-year period associated with an increase in value of the Proctor & Gamble stock from "reinvested income and capital gain" was the decision to enroll in the stock's dividend reinvestment program. The routine and rudimentary nature of the decision to enroll in a dividend reinvestment program does not constitute substantial or active management, particularly where there is no evidence as to the time, energy, and resources expended in conjunction with the decision.[15] *See Nordberg,* 658 A.2d at 219 (explaining that spouse's single act of directing transfer of funds from account established prior to marriage to another account did not affect funds' nonmarital status).

[¶ 34] We conclude that the court's finding that Barry had "a substantial active role in managing [his] investments" cannot, without more, form the basis for concluding that he had a substantial active role in the management of the four remaining Putnam Trust stocks and, in particular, the increase in value associated with the Proctor & Gamble stock. Further, even if we assume that he did have a substantial active role in the management of the Putnam Trust stocks, the only portion of the stocks that can potentially be deemed marital property in accordance with section 953(2)(E)(1)(b) and (2)(c) are the 16.696 shares of Proctor & Gamble stock that were acquired during the marriage through reinvested income. Notwithstanding evidence of Barry's substantial active role in the management of his portfolio as a whole, all of the original shares of stock he inherited in 1992, as increased by stock splits, should be treated as nonmarital property pursuant to section 953(2)(A); the increase in value of those shares of stock due to market forces should be treated as nonmarital property pursuant to section 953(2)(E)(1)(a); and the increase in the number of shares of Proctor & Gamble stock acquired with reinvested income should be treated as nonmarital property pursuant to section 953(2)(E)(1)(b) and (2)(c).

[¶ 35] Together, the four Putnam Trust stocks comprise approximately $166,424 of the stock portfolio valued at approximately $545,977 awarded by the divorce judgment to Barry as marital property. On remand, the court will need to reconsider its overall distribution of the Warners' marital property after setting apart to Barry the four Putnam Trust stocks as nonmarital property.[16]

---

14. Barbara testified that Barry's only job in recent years was his management of the investments and that he devoted a significant amount of time to it. Barry testified that he dedicated, on average, about one hour per week to his stock portfolio. Barry's demonstrated knowledge regarding his stocks and his expertise in utilizing his computer and the Internet in connection with them, together with his interrogatory answers in which he stated "he is self employed and his job is managing his financial affairs and investments," caused the court to conclude that he had a substantial active role in managing the investments.

15. "Nominal, inconsequential or sporadic actions by a spouse in connection with non-marital property will not cause the increase in value of the property attributable to reinvested income to be treated as marital property." FLAC Recommendation, *supra* note 12, at cmt. 2.

16. The value of the Putnam Trust stocks set apart to Barry must still be considered by the court in arriving at an equitable distribution of the marital property. 19–A M.R.S.A. § 953(1)(B) (1998) ("[T]he court shall ... divide the marital property in proportions the court considers just after considering all relevant factors, including: ... [T]he value of the property set apart to each spouse"). In addition, the fifty shares of Union Pacific stock acquired in 1999 must be treated as marital property.

#### D. Spousal Support

[¶ 36] Barry challenges the court's spousal support award asserting the court erred (1) in its determination of the parties' incomes and expenses; (2) by ordering an irreducible increase in the amount of spousal support eight years in the future from $1000 per month to $2000 per month; and (3) by requiring him to maintain a $300,000 life insurance policy payable to Barbara, or other security acceptable to Barbara and her attorney, to secure the payment of spousal support.

##### 1. Parties' Incomes

■ [¶ 37] The record supports the court's conclusion that because of the parties' relative economic circumstances, their thirty-five years of marriage, their ages, and Barbara's questionable health and its impact upon her capacity to continue her massage business, an indefinite award of general spousal support to Barbara was justified. This finding is not clear error. Similarly, the court's findings regarding the parties' respective living expenses were based upon competent evidence and are not clear error.

[¶ 38] The statute directs that one of the factors the court must consider when determining spousal support is the "income history and income potential of each party." 19–A M.R.S.A. § 951–A(5)(E) (Supp. 2001); *Sorey v. Sorey*, 1998 ME 217, ¶ 10, 718 A.2d 568, 570. The court found, based upon Barbara's income history and potential, that her expected income was approximately $32,000, consisting of $15,000 from her part-time work as a massage therapist, $15,149 per year in income from J.B.B., Inc., and $1873 per year rental income from her Florida condominium. The court

determined that Barry will have a post-divorce annual income of approximately $65,500 comprised of annual distributions totalling $25,000 from the Robert Lyon Warner Trust, investment income of $34,500 based upon an estimated 6% return on his stock portfolio valued at $575,000, and $6000 in wages from part-time employment.

[¶ 39] Barry asserts that the court committed clear error in its determination of the parties' incomes because (1) the court valued the stock portfolio as worth $545,977, not $575,000, in the property distribution section of the divorce judgment; (2) it attributed his potential IRA income to him but failed to attribute Barbara's potential IRA income to her; and (3) it failed to account for the fact that his holdings will be reduced by $35,000 in order to pay $35,000 in attorney fees as ordered by the judgment, and by an additional $22,043 from a corporate investment account that was included in the valuation of Barry's stock portfolio but awarded to Barbara as part of the assets of J.B.B., Inc.[17]

[¶ 40] In its judgment the court stated that Barry "agreed at trial that six percent would be a reasonable return from his stocks, bonds, and IRA's [sic]; that return totals $34,500 annually." In its order on the motions to reconsider the court explained that it based this finding on the defendant's testimony that his holdings were worth $575,000. It also found that "The IRA's [sic] are increasing in value. That increase should not be ignored because its receipt may be deferred." The trial transcript reflects that when Barry was asked to estimate the total value of "all holdings," including his IRAs, he estimated the total value at $575,000. This

---

**17.** Barry raises additional challenges to the spousal support determination that we find to be without merit and do not address.

testimony is, however, inconsistent with the court's separate findings that the stock portfolio has a value of $545,977, and the IRA accounts awarded to Barry have a value of $66,387, for a combined value of $612,364.

[¶ 41] Because the judgment reflects that the court intended to include the potential income from the IRAs awarded to Barry in determining his ability to pay spousal support, it should have also attributed the potential income from the IRAs awarded to Barbara in determining her need for spousal support. The IRA accounts awarded to Barbara had a total value of $71,654 that, at an assumed 6% rate of return, would produce income of $4299 per year.

[¶ 42] The judgment should also account for the fact that Barry's overall holdings, whether valued at $575,000 or $612,364, will be reduced by (1) $35,000 in attorney fees he was ordered to pay Barbara within sixty days of the judgment; and (2) $22,043 from the Vanguard Index 500 account that was awarded to Barbara as an asset of J.B.B., Inc., but which was included in the stock portfolio in arriving at its overall value. At a 6% rate of return, these adjustments in the value of the investment assets available to Barry would reduce Barry's income by $3422 per year.

[¶ 43] Considered together, the foregoing adjustments are substantial and should be taken into account in determining the income potential of the parties, see 19–A M.R.S.A. § 951–A(5)(E) (Supp.2001), and Barry's ability to pay spousal support, see id. § 951–A(5)(B) (Supp.2001).[18]

2. Irreducible Increase in Spousal Support

[¶ 44] The court specified that the spousal support award would increase to $2000 a month on December 30, 2009, more than eight years after the court's order. It also specified that this award would survive Barry's death and could not be decreased. As reflected in the court's order on the motions to reconsider, this doubling of the amount of spousal support was tied to Barry's anticipated receipt of a 20% share of the Robert Lyon Warner Trust, which is to be distributed in 2009. The court determined that the trust's value as of September 1999 was $7,487,509.67.

[¶ 45] Certainly, receipt of a 20% share of a trust, worth approximately $1.4 million dollars to Barry, could, if and when received, constitute a substantial change of circumstances justifying an increase in the spousal support payment. However, in other respects, mandating that there be a $2000 monthly payment beginning in December 2009 and barring reduction of that payment are heavily based on speculative predictions of the parties' future economic circumstances. First, it assumes that Barry's estate will be entitled to receive his share of Robert Lyon Warner Trust proceeds if he dies prior to the distribution. Neither party introduced a copy of the trust instrument, nor did the court receive any testimony which specifically addressed the trust's provisions as they pertain to whether trust proceeds are payable to a beneficiary's estate. Although the court found that the trust was "irrevocable," it received no evidence from which it could determine whether Barry's right to receive a distribution from the trust in 2009 is

---

18. Barry also asserts on appeal that the funds deposited in the IRA accounts cannot be accessed by either party without incurring a substantial penalty and should not, therefore, be viewed as a current source of income for either party. Although we do not address this issue, the court may, at its discretion, reconsider this issue on remand.

contingent upon his survivorship.[19]  It also received no evidence from which it could determine whether the trust is permitted or required to make distributions to other individuals or payments (for example, the payment of administration expenses) prior to its termination in 2009 that would diminish the value of Barry's 20% share.

[¶ 46] The court's order also assumes that the trust, eight years hence, will have a value similar to that which it had in September of 1999, although the court received no evidence regarding the nature of the assets comprising the trust's corpus. However, the recent history of stock valuations demonstrates the speculative nature of predicting the future value of investment assets without considering the assets' market volatility.  We take judicial notice of the fact that stock values are dramatically lower today than they were six months ago.  Recent history demonstrates the potential for unforseen events to dramatically and adversely affect stock values.

[¶ 47] Because spousal support is necessarily based to some extent on prediction of future economic events, some future uncertainty is appropriate in developing spousal support obligation calculations. Dramatic changes for better or worse in the circumstances of the payor or the payee can be accommodated by the capacity of either party to return to court and request a change in the amount of spousal support based on a demonstrated substantial change of circumstances.  19–A M.R.S.A. § 951–A(4) (Supp.2001);  see also Spencer v. Spencer, 1998 ME 252, ¶ 9, 720 A.2d 1159, 1162.  That possibility is taken away when, as here, a court orders, as authorized by law, that a spousal support award be guaranteed to survive after death of the payor and that it not be decreased.  19–A M.R.S.A. § 951–A(3)(A), (4), (8) (Supp. 2001).

■ [¶ 48] When such an order prohibiting change is entered, we must necessarily review much more carefully the extent to which the future economic conditions of the parties may be based upon speculative prediction.  We have stated on several occasions that spousal support awards may not be based on speculative predictions of future economic circumstances.  Ketchum v. Ketchum, 1998 ME 62, ¶ 5, 707 A.2d 803, 804–05, aff'd 2000 ME 13, 743 A.2d 1270; Ryan v. Ryan, 1997 ME 136, ¶ 8, 697 A.2d 60, 61–62.  Here, the award is unduly speculative because there is no evidence from which the court could determine the likely value of Barry's share of the Robert Lyon Warner Trust eight years in the future, nor was there evidence from which

---

19.  The court made the following specific findings in its order on defendant's two motions to reconsider regarding the Robert Lyon Warner Trust:

Although marked as defendant's exhibit 3, the trust documents were not offered into evidence.  The defendant did not testify that his receipt of the Robert Lyon Warner Trust in 2009 is dependent on his survival.  He testified about what would have happened 'back then' if he had died before the birth of his son.  He testified during his deposition that he would be able to take care of his wife for the next 30–40 years, 'one way or the other.'

At the time of the divorce trial in 2001, the parties' son was 30 years of age.  Defendant's deposition testimony to the effect that, prior to the birth of his son 30 years ago, he anticipated that he could take care of his wife for 30 to 40 years establishes that he expected that he would receive regular payments of income from the Trust until 2009, which is approximately 38 years from the birth of the parties' son.  This testimony does not establish whether Barry must survive to receive his 20% distributive share in 2009.  Similarly, the fact that Barry "did not testify that his receipt of the Robert Lyon Warner Trust in 2009 is dependent upon his survival" also does not establish whether there is a survivorship requirement because Barry provided no testimony on this issue.

the court could determine whether the Robert Lyon Warner Trust proceeds would be paid to Barry's estate if he is not alive at the time of the distribution in 2009. The predictive judgment required of the court is often difficult and requires a careful analysis of the evidence as it pertains to future events and circumstances. In this case, closer scrutiny of the terms of the trust instrument, as well as the nature of the investments comprising the trust corpus and the degree of market risk associated with them, would be essential to determine whether Barry or his estate will receive a trust distribution in 2009 that approaches the amount forecasted in 2001. It is incumbent upon the party seeking an unmodifiable award of general support to provide the court with competent evidence from which a predictive judgment can be made.

[¶ 49] Accordingly, the immediate award of spousal support in the amount of $1000 per month must be vacated because of the adjustments that should be made to the parties' respective incomes, and the future award of spousal support, as it relates to the $2000 monthly payments to be instituted as of December 30, 2009, must also be vacated because it is unduly speculative. We therefore remand for full reconsideration of the spousal support award. On remand, the court should redetermine the amount of its spousal support award effective as of the entry of the divorce judgment, taking into consideration the adjustments discussed above. In addition, in view of the passage of time, the court may receive evidence to determine whether there has been a substantial change in the parties' financial circumstances since the entry of the divorce judgment and, if so, order a prospective modification of the spousal support award.

### 3. Life Insurance or Other Security

[¶ 50] The divorce judgment provides that the spousal support "will survive the death of the defendant. The defendant will maintain life insurance in the amount of $300,000 with the plaintiff as the sole beneficiary or will provide other security acceptable to the plaintiff and her attorney to secure payments." Barry asserts that, as ordered, if he predeceases Barbara the life insurance requirement will result in a windfall to Barbara because she will be entitled to receive both the $300,000 life insurance payment and continued spousal support. In addition, Barry complains that the court received no evidence regarding the availability and cost of the life insurance, and its impact upon his ability to pay monthly spousal support.

[¶ 51] The requirement of life insurance or other security for spousal support awards is authorized by 19–A M.R.S.A. § 951–A(7) (Supp.2001), which provides in part that "[t]he court may also order the obligated party to maintain life insurance or to otherwise provide security for the payment of spousal support in the event the obligation may survive the obligated party's death." In *Bryant v. Bryant,* 411 A.2d 391, 394 (Me.1980), we recognized the court's authority to employ life insurance as security for spousal support where the "life insurance ... can take the place of the periodic payments after the payor's death." In *Bryant,* however, we vacated the divorce judgment's life insurance requirement because the court had not received evidence of either the availability or cost of such insurance, and could not, therefore, determine the payor's ability to obtain the insurance and pay for it. *Id.* at 395.

[¶ 52] Here, as in *Bryant,* the court did not receive evidence of the availability or cost of the life insurance policy that it required Barry to obtain for Barbara's benefit. In addition, the divorce judgment

does not address whether the $300,000 life insurance benefit is intended to replace or merely supplement Barry's estate's obligation to pay monthly spousal support following Barry's death.

[¶ 53] Accordingly, we vacate the divorce judgment's provision regarding life insurance or other security and remand it to the court to permit it to receive evidence as to the availability and cost of life insurance to Barry; to address the impact of the cost of the life insurance upon Barry's ability to pay monthly spousal support; and to address whether the life insurance is intended to replace or supplement the ongoing spousal support in the event Barry predeceases Barbara. Consideration may also be given to whether the amount of insurance or security should reflect a descending benefit or security level to take into consideration the amount of support ordered and Barbara's life expectancy, if the parties introduce evidence which reasonably permits the same.

E. Attorney Fees

■■■ [¶ 54] Attorney fees awards in actions for divorce are reviewed for an abuse of discretion. *Largay v. Largay,* 2000 ME 108, ¶ 16, 752 A.2d 194, 198. In this case, the award of $35,000 towards Barbara's attorney fees was within the court's discretion. The award considered the differing economic circumstances of the parties, and the substantial efforts that both parties were required to undertake to litigate the marital versus nonmarital status of the portions of the stock portfolio exclusive of the Putnam Trust stocks. However, because the court on remand must reconsider all aspects of the parties' financial relationship reflected in both the court's property distribution and spousal support awards, it must also, by necessity, reconsider the amount of attorney fees to be awarded to Barbara.

Therefore, the entry shall be:

Judgment vacated in part and remanded to the Superior Court to (1) reconsider the distribution of marital property and to set apart to Barry Warner the Putnam Trust stocks as his nonmarital property; (2) reconsider the spousal support award and the associated requirement of life insurance or other security; and (3) reconsider the attorney fees award, all in accordance with this opinion. In all other respects, the judgment is affirmed.